# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

KEITH ALLARD and
BENJAMIN GRAHAM,

     Plaintiffs,                 File No.

v.                                Hon.

MICHIGAN HOUSE OF
REPRESENTATIVES,

     Defendant.

_____

## COMPLAINT AND JURY DEMAND
_____

### Complaint

Plaintiffs Keith Allard and Benjamin Graham, by and through their attorneys, Pinsky, Smith, Fayette & Kennedy, LLP, state as follows:

### Jurisdiction, Venue, and Parties

1.    This is an action requesting the Court to remedy violations of rights under the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; and to remedy violations of Michigan's Whistleblowers' Protection Act and other related torts under state law.

2.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.  It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts

as the federal claims. Therefore, this Court's exercise of supplemental jurisdiction will further judicial economy, convenience, and fairness to the parties.

3. Plaintiff Keith Allard is a resident of Kent County, Michigan, and the Western District of Michigan, Southern Division.

4. Plaintiff Benjamin Graham is a resident of Genesee County, Michigan, and the Eastern District of Michigan, Southern Division.

5. Defendant Michigan House of Representatives ("the House") is one of two chambers of the legislative body of the State of Michigan created by the Michigan Constitution. The House conducts its business in Lansing, Michigan, in Ingham County, in the Western District of Michigan, Southern Division. Its members are elected from 110 districts covering the entire State of Michigan to represent constituents in each of those districts.

6. Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

<u>Factual Allegations</u>

7. Plaintiffs were employed by Defendant Michigan House of Representatives in the combined offices of now-former State Representatives Todd Courser and Cindy Gamrat from January 2, 2015 until July 6, 2015.

8. Todd Courser is an individual residing in Lapeer County, Michigan. Courser was the elected State Representative for the 82nd District and, as such, a member of the Michigan House of Representatives, until he resigned his position on September 11, 2015, shortly before the House was preparing to vote to expel him.

9.      Cindy Gamrat is an individual residing in Allegan County, Michigan. Gamrat was the elected State Representative for the 80th District and, as such, a member of the Michigan House of Representatives, until the House voted to expel her from the chamber on September 11, 2015.

10.     Mr. Allard began employment on January 2, 2015, as the chief of staff for Gamrat, who was beginning her first term in office.

11.     Mr. Graham began employment on January 2, 2015, as a staff person for Courser, who was beginning his first term in office.

12.     At various House employment orientation sessions for staff members at the beginning of the 2015-16 term in January 2015, the House Business Office, which runs the administrative affairs of the House, repeatedly reiterated to all staff that any employment issues should be brought to the attention of either Norm Saari, Brock Swartzle, or the House Business Office.  In January 2015, Mr. Saari was the chief of staff of the Speaker of the House, Rep. Kevin Cotter.  Mr. Swartzle was House Majority Counsel.

13.     Almost immediately after taking office, Courser and Gamrat took the unusual step of combining their legislative offices, including their physical office space, operations, and staff.

*The Problems in Courser and Gamrat's Combined Office Begin Immediately*

14.     Sometime around the second week of January, Mr. Saari initiated a private meeting with Mr. Allard.  In that meeting, Mr. Allard shared some concerns with the working environment in the office of Courser and Gamrat, which had

become apparent even in that short time. For example, Courser immediately determined he did not like the desk configuration in his office as had been installed by the House Business Office. After being informed that it was contrary to House Business Office policy to remove the furniture, Courser took it apart and left it in a pile in the hallway to be retrieved by House Business Office staff. Courser and Gamrat also used the state's email to send antagonistic, inflammatory messages and had a generally vitriolic attitude towards their fellow legislators almost immediately. Mr. Allard explained to Mr. Saari how – this soon into their new jobs – it was already difficult to please Courser and Gamrat, and that Courser and Gamrat's bizarre behavior was embarrassing to the staff. Worse, it was making it awkward for Plaintiffs and the other staff person to interact with others in the House and difficult to do their jobs. Mr. Allard said he and the other staff in no way condoned the actions of Courser and Gamrat, and in fact felt their behavior to be completely contrary to the proper way legislators should conduct themselves. Mr. Saari agreed with Mr. Allard.

15. It also quickly became clear to the staff that Gamrat and Courser – both of whom are married to other people – were engaging in an extramarital affair. In a staff meeting on or around January 13, 2015, Gamrat and Courser prohibited their staff from informing Gamrat's husband Joe of her or Courser's whereabouts. Gamrat and Courser instructed the staff to lie or obfuscate the truth to Mr. Gamrat if he called asking about the schedules of Gamrat and Courser. This situation further made the working environment awkward and difficult, to say the least.

16.     In the first two weeks of January, Courser and Gamrat assigned a number of tasks to their government office employees, including Plaintiffs, for the "Statewide Grassroots Pow Wow."  This was a political, non-governmental event promoted by Courser and Gamrat and other private interests.  Courser and Gamrat expected and required Plaintiffs to undertake this work on state government time. Plaintiffs felt that refusal to participate in the work as instructed would negatively impact their continued employment.

17.     Gamrat and Courser also regularly assigned Plaintiffs to facilitate the delivery of emails which would be distributed through a political database obtained and paid for by regulated campaign committee funds.  As tactfully as possible, Plaintiffs regularly pointed out that this was not an allowed use of government staff during the state office work day, but Courser and Gamrat still required them to send out these political communications as a condition of their employment. Plaintiffs sent out at least three such communications in January and more than a dozen more such communications throughout the entire tenure of their employment.

18.     On or about the morning of either February 11 or 12, 2015, Mr. Gamrat informed Mr. Allard in a phone call that he observed Cindy Gamrat leaving Courser's hotel room at the downtown Lansing Radisson hotel in the early hours of the morning.  Joe Gamrat reported that a verbal confrontation ensued, and hotel security removed Mr. Gamrat from the premises.  Cindy Gamrat and Courser were

both late to the office that morning, appeared disheveled, and exhibited bizarre

behavior.  In particular, Cindy Gamrat smelled of alcohol.

*Plaintiffs Begin Making Specific, Multiple Reports of Misconduct to Speaker*
*Cotter's Staff*

19.     Sometime soon thereafter, around the second week of February, Mr.

Allard initiated a meeting attended by him, Mr. Saari, Mr. Graham, and Josh Cline,

the other Courser/Gamrat office staff member.  At this meeting, Messrs. Allard,

Graham and Cline specifically reported to Mr. Saari:

> a.  that Courser and Gamrat were not working and were apparently
>     not usually engaged with legislative business during normal work
>     hours, and as a result, were forcing staff to work extensive hours on
>     nights and weekends to make up for the lack of time Courser and
>     Gamrat were putting in during actual work hours.
>
> b.  that Courser and Gamrat asked them to send political emails
>     during hours of state employment.  Messrs. Allard, Graham and
>     Cline reported to Mr. Saari that they did not condone using state
>     resources for political purposes and did not wish to continue
>     participating in those as a condition of their employment.
>
> c.  that there were significant, difficult-to-ignore signs that Courser
>     and Gamrat were having an extramarital affair, and that Cindy
>     Gamrat's husband had been sharing the same types of suspicions
>     with the staff, which put the employees in an untenable position.

20.     During this February meeting with Mr. Saari, House Speaker Cotter

walked through Mr. Saari's office.  After a brief introduction to Messrs. Allard,

Graham and Cline, Mr. Saari shared with House Speaker Cotter some of the staff's

concerns, specifically the extra hours outside of regular business being required of

them and the issues with emails and outside communications which violated the

rules against using taxpayer resources, i.e., State equipment, office space, and staff

time, for political purposes.  Speaker Cotter appeared genuinely concerned and asked Messrs. Allard, Graham, and Cline to continue to keep Mr. Saari abreast of any additional issues.

21.     When the situation did not improve, about a month later Mr. Allard went to Mr. Saari a third time for assistance, sometime in March 2015.  In this meeting, Mr. Allard again told Mr. Saari in no uncertain terms that he felt that Courser and Gamrat were abusing taxpayer resources, including their staff.  Mr. Allard implored Mr. Saari to consider finding other employment in the House for Messrs. Graham and Cline, whom Mr. Allard supervised.  The meeting lasted for nearly an hour, and Mr. Saari seemed to share Mr. Allard's concerns.

22.     On at least two additional occasions, Mr. Allard briefly discussed the situation with Mr. Saari after meetings or in the Capitol during chance encounters.  On each of those occasions, Mr. Allard reiterated that Courser's and Gamrat's demands of their staff were getting worse and more inappropriate, not better.

23.     In April 2015, Mr. Cline resigned from employment in the combined offices of Gamrat and Courser because he found the working environment unbearable.

24.     Increasingly, Courser and Gamrat were misusing their staff for what appeared to be an alibi for their liaisons.  Regularly, Courser and Gamrat would schedule meetings late at night or not during regular business hours, requiring Plaintiffs to come to Lansing or stay there long after the work day ended.  Once the "meeting" would begin, Courser and Gamrat would stay for a short period of time,

sometimes as little as 10 minutes, and then leave together.  Plaintiffs would then field calls later, usually from Joe Gamrat, who was looking to confirm that Cindy Gamrat was in her office for a meeting when she had apparently told him that was the reason she needed to be in Lansing.

25.    Like most House staffers working for individual representatives, Plaintiffs' relationships with Courser and Gamrat pre-dated their employment and had started because they shared many political beliefs.  Mr. Graham had met Courser when Graham was still in high school and becoming active in local conservative politics.  Mr. Graham had volunteered on more than one campaign of Courser's and had devoted substantial time to getting him elected, without pay. Mr. Allard had met Cindy Gamrat because of their mutual involvement in conservative politics and because both had campaigned for office with backing by some of the same donors and interest groups.  Mr. Allard had donated to, volunteered for, and informally consulted with Gamrat on her campaign for office.

26.    Both Plaintiffs worked without pay after the November 2014 election with Courser and Gamrat in preparation for them to take office.  Plaintiffs were excited to work to advance policy goals that they believed they shared with Courser and Gamrat.

27.    However, what Plaintiffs found once they began working for Courser and Gamrat on a daily basis in the House of Representatives was more than just the personal disappointment of realizing that the two were engaging in an extramarital affair.  Plaintiffs found that Courser and Gamrat were largely

disengaged from the legislative process, and had ignored information about how the work of legislating happens which would have enabled them to capitalize on opportunities to advance their political objectives.  Because Plaintiffs believed in the policy positions and values that Courser and Gamrat stood for – at least publicly – Plaintiffs tried to ignore the affair and be as discreet as possible about it, which Courser and Gamrat made increasingly difficult.  Plaintiffs tried to just do their work as best they could and compensate for Courser and Gamrat's lack of involvement with their districts' constituents by covering for their absences and resolving constituent concerns and contacts mostly on their own.

28.     On May 15, 2015, Mr. Gamrat informed Mr. Allard that he had obtained "physical proof" that his wife, Cindy Gamrat, and Todd Courser were having an extramarital affair.  Mr. Gamrat told Mr. Allard that he had confronted his wife about it, and she admitted the affair.

29.     Thereafter, both Courser and Gamrat seemed sullen, anxious and depressed.

### *Courser and Gamrat Attempt to Involve Mr. Graham in Their Misconduct*

30.     On the evening of May 19, 2015, Courser called Ben Graham to his Lapeer law office around 10:30 p.m.  Courser said he needed to talk to Mr. Graham about something important and, without further explanation, said that he needed Graham "to destroy" him.  Mr. Graham's wife was still at work, and he was home alone with his then-infant son. He told Courser that he would need to wait for his wife to return from work to stay with their baby.  In the meantime, Mr. Graham

was concerned about Courser's state of mind, having observed Courser after Mr. Allard informed Mr. Graham that Mr. Gamrat said Mrs. Gamrat admitted the affair.  Mr. Graham also knew Courser kept a loaded handgun in his office.  Mr. Graham was afraid to go to Courser's office but felt that he had to in order to avoid professional repercussions in his role as a legislative staffer.  He called Mr. Allard for advice, and they decided that Mr. Graham needed to secretly audio-tape the meeting in case Courser became violent or attempted to commit suicide.

31.    When Mr. Graham arrived at Courser's law office late that night, Courser asked Mr. Graham to take personal sick time off on May 20 to send an outlandish, untrue anonymous email to a variety of Courser's supporters and others in Republican political circles, accusing Courser of having sex with a male prostitute and being a drug abuser, among other claims.  Gamrat called Courser during the meeting by telephone and offered to convince Mr. Graham to send the email.  Courser wanted Mr. Graham to send the email from an anonymous email account so that if news broke of his extramarital affair with Gamrat, Courser could later claim that he was being targeted by political enemies.  He also said that such an email would be so outlandish that it would constitute a "controlled burn" to "inoculate the herd" if news of his actual extramarital affair with Gamrat ever broke.  Mr. Graham urged Courser not to engage in this type of deception, and refused to send the email.  Unbeknownst to Courser and Gamrat, Mr. Graham audiotape-recorded this meeting, which was legal under Michigan law for Mr. Graham to do.

32.     Although Ben Graham never sent the "controlled burn" email, someone sent the email anonymously to a vast number of people on or about May 20, 2015. Upon information and belief, according to a report of the Michigan State Police, a friend of Courser's, Immanuel "Ike" Eickholdt, anonymously sent the email at Courser's direction.

### *Plaintiffs' Reports of Misconduct Continue To Speaker Cotter's Staff, Now Including Information on the Deceptive "Controlled Burn" Email*

33.     On the morning of May 21, 2015, Mr. Graham requested a meeting with Mr. Saari and specifically requested that Mr. Swartzle be in attendance.  At Mr. Saari's request, Mr. Graham met with them off state property at the GCSI lobbying firm.  Mr. Graham detailed for Messrs. Saari and Swartzle all of the events of the night of May 19, 2015, when Courser asked him to send the infamous email designed to divert attention from the Courser/Gamrat affair, which Mr. Graham refused to send.  Mr. Graham also confirmed for Messrs. Saari and Swartzle that it was true that Courser and Gamrat were having an illicit romantic affair, and said in no uncertain terms that he had "undeniable physical proof" of everything he was telling them.  Mr. Saari asked Mr. Graham to "stick it out" in the short term and that they would work to find him other employment.

34.     Also on May 21, 2015, Courser and Gamrat called Mr. Graham into their government office during business hours to confirm that they had sent the "controlled burn" email.  Gamrat specifically asked Mr. Graham to keep the affair quiet.  Mr. Graham repeatedly asked Gamrat and Courser to attend to pending legislative work, but Gamrat and Courser instead insisted on continuing to discuss

their affair and the cover-up they initiated.  Courser missed a meeting of the

Military and Veterans' Affairs Committee to continue to meet with Graham to

discuss his affair, despite Mr. Graham's insistence that he attend the committee

meeting.  Courser later blamed his absence to the Committee Chairman on a "staff

mix-up."

35.     Soon after his May 21 meeting with Mr. Saari, Mr. Graham sent a text

message to Mr. Saari stating that Courser was retaliating against him for refusing

to send the false "controlled burn" email and for opposing other abusive demands.

Mr. Graham asked Mr. Saari if he had made any progress on finding Mr. Graham

another position.  Mr. Saari replied that he had not made progress but that he was

working on it.

36.     Although Mr. Graham was becoming increasingly weary of his working

environment and told Mr. Saari that he was considering just quitting entirely, Mr.

Saari encouraged Mr. Graham to stay "for the good of the district" until Mr. Saari

could handle the situation.

37.     In the meantime, other members of the staff of Speaker Cotter had

information corroborating what Plaintiffs had told Messrs. Saari and Swartzle.

Upon information and belief, Matt Golden, Speaker Cotter's Deputy Chief of Staff,

knew of the confrontation at the Lansing Radisson hotel between Cindy Gamrat

and Courser, and Cindy Gamrat's husband Joe, because he made efforts to obtain a

copy of the police report relating to the confrontation.  Indeed, this confrontation

had been the talk of Lansing political circles.  Upon information and belief, Mr.

Golden made efforts to obtain a copy of any police report pertaining to the event in an attempt to prevent its release to the media.

38.     On the morning of May 26, 2015, a staff person with House Republicans approached Mr. Allard in a hallway and said that he knew Courser had sent the infamous "controlled burn" email. He said that numerous people in his division and within Speaker Cotter's office had received it and that "Speaker Cotter's office" was aware that Courser had sent it. This staff person told Mr. Allard that he had been directed by Mr. Golden that speaking about the email or its authorship would be considered a "fireable offense."

39.     Sometime in June, a Twitter account was formed under the name "Romance at the Radisson" that satirized the rumored romance of Courser and Gamrat.  This Twitter account and its allegations spread like wildfire through the House Office Building and caused much consternation for Plaintiffs in encounters with fellow House staff.  Neither Plaintiff created this account or knew who did. Mr. Allard heard that Mr. Golden was trying to track down whoever may have created that account.  Around this time, Mr. Allard texted Mr. Golden and requested a meeting, but Mr. Golden never responded.

40.     After Ben Graham refused to send the "controlled burn" email anonymously, Courser and Gamrat indeed began to retaliate against Mr. Graham because of his refusal.  Apparently not realizing that Mr. Allard knew what Courser and Gamrat had asked Mr. Graham to do, Courser and Gamrat began a campaign to smear Mr. Graham with Mr. Allard.  They began unfairly and inaccurately

complaining about his work, allegations which Mr. Allard told Courser and Graham were not true.  Courser in particular tried to malign Mr. Graham's character in an attempt to convince Mr. Allard to adopt the view that Mr. Graham was not a good employee, but Mr. Allard did not validate Courser's character attack on Mr. Graham.

41.     To replace Mr. Cline, the staffer who had quit in April because he was fed up with the office environment, Courser and Gamrat hired a new employee, Anne Hill, who they knew from Tea Party activism, and then a part-time employee, Karen Couture, who also worked in Courser's law office in Lapeer.

42.     Upon information and belief, Courser and/or Gamrat instructed Mses. Hill and Couture to look for an excuse to terminate Mr. Graham's employment, having been rebuffed in those efforts by Mr. Allard.  Upon information and belief, Courser and/or Gamrat instructed them to go through Mr. Graham's email when he left his computer and to go through his papers and personal effects.

43.     Shortly after Ms. Hill began working at the office, Plaintiffs took her outside for a walk on the Capitol lawn to speak to her privately.  Mr. Allard told her that she needed to know that Courser and Gamrat were having an extramarital affair and that if she ever felt sexually harassed or subjected to a hostile work environment, she should report her concerns directly to Messrs. Saari or Swartzle in Speaker Cotter's office.  Plaintiffs also informed Ms. Hill that Courser and Gamrat had asked Mr. Graham to send the "controlled burn" email, and that Mr. Graham had refused.  Plaintiffs told Ms. Hill that Courser and Gamrat wanted

them to do various other tasks that they believed to be unethical or illegal, and Mr.

Allard warned Ms. Hill to report it if she ever felt that Courser and Gamrat asked

her to do something that she felt could be unethical or illegal.

### *Courser and Gamrat Discover Plaintiffs Have Been Reporting Their Misconduct and Illegally Retaliate By Causing the House of Representatives to Fire Plaintiffs*

44.     Instead, Ms. Hill reported the conversation she had with Plaintiffs to

Courser and/or Gamrat.

45.     On or about July 3, 2015, Joe Gamrat called Mr. Allard.  He told Mr.

Allard that he had been secretly listening to a conversation between Courser and

his wife, Cindy Gamrat.  Joe Gamrat told Mr. Allard that he overheard Courser and

Cindy Gamrat talking about what Ms. Hill reported to them, including that

Plaintiffs had reported Courser and Gamrat's various unethical and illegal acts to

Messrs. Saari and Swartzle and, to some degree, Speaker Cotter.  Mr. Gamrat told

Mr. Allard that Courser and Cindy Gamrat intended to fire Plaintiffs on the next

business day in retaliation for making the reports.

46.     On July 6, 2015, Courser and Gamrat met with Plaintiffs.  Upon

information and belief, Courser and Gamrat were trying to secretly tape the

meeting.  Courser and Gamrat denied having any role in sending the email that

Courser had asked Mr. Graham to use sick time off to send on May 19, 2015.

Courser also told Plaintiffs that they could decide whether they wanted to take "the

high road" or "the low road" out of Lansing.  Courser and Gamrat then ushered Tim

Bowlin, director of the House Business Office, into the room.  Mr. Bowlin escorted

Plaintiffs to his office, and terminated their employment.  Mr. Bowlin did not give a reason for their termination.

47.     During the afternoon of July 6, 2015, following their termination, Plaintiffs requested a meeting with Messrs. Saari, Bowlin, and Swartzle.  Mr. Swartzle was not present but called in via speakerphone.  Now with Mr. Bowlin there as well, Plaintiffs reiterated the various reports of misuse of taxpayer resources and generally inappropriate and retaliatory behavior by Courser and Gamrat that they had brought to Messrs. Saari and Swartzle over the previous six months.  Plaintiffs also brought up several other abuses of taxpayer resources that had occurred in the time since previous meetings with Messrs. Saari and Swartzle.  Mr. Bowlin said that he had wished Plaintiffs had made him aware of these issues, but Plaintiffs reported that the House Business Office orientation and other training made it clear that any employment issues could be addressed with Messrs. Saari, Swartzle, or Bowlin.  All parties to this meeting agreed that was part of the orientation.

48.     Within two hours following this "exit interview" of Plaintiffs, two reporters from separate news services contacted Mr. Allard.  Both reporters had intimate details of the exit interview, some of which had never been shared with anyone outside of those attending the exit interview.  The reporters asked Mr. Allard to confirm for their reporting that he and Mr. Graham had been fired, and that the events described to them by sources speaking off-the-record had indeed occurred.

49.     On or about July 8, 2015, Mr. Allard spoke to Mr. Bowlin on the telephone. Mr. Bowlin firmly denied having spoken to the media about what was discussed during the termination "exit interview," but said he had received similar calls from members of the media, and said that he could not control what members of the Speaker's office told the media. Mr. Bowlin also said that he was "very surprised" that no one from the Speaker's office, i.e., Messrs. Saari or Swartzle, had made him aware of the issues that Plaintiffs had brought to members of the Speaker's staff, given that Plaintiffs had informed the Speaker's office on numerous occasions.

50.     After July 8, 2015, based on Mr. Allard's conversation with Mr. Bowlin, and the reasoning that only someone present in the exit interview could have given the details to reporters that they now possessed, Plaintiffs knew that either Mr. Saari and/or Mr. Swartzle, or someone at their direction, had spoken to the Lansing news media and leaked the information that Defendant had fired Plaintiffs at the behest of Courser and Gamrat.

### *Plaintiffs Report the Misconduct to The Detroit News*

51.     Later that month, Plaintiffs went to Detroit News reporter Chad Livengood, who covers state government, to give him the information they had that they believed to be of public concern, including that: (a) Courser and Gamrat were responsible for the infamous "false flag" May 20 email and had asked Mr. Graham to send it anonymously and deceptively; (b) Courser and Gamrat retaliated against Mr. Graham once he would not send it; (c) Courser and Gamrat misused taxpayer

resources to carry on their extramarital affair and in their attempt to keep it secret;
and (d) Courser and Gamrat misused taxpayer resources by requiring Plaintiffs to
work on political business while on state time. Plaintiffs believed that without
disclosing this information to Mr. Livengood, this information of public concern
would continue to be covered up by Courser, Gamrat, and members of the Speaker's
office, including Messrs. Saari and Swartzle.

52.    On August 7, 2015, the Detroit News, in a story by Mr. Livengood,
published the information about the affair and misconduct in office, including abuse
of taxpayer resources, by Courser and Gamrat.

53.    Thereafter, Courser and Gamrat falsely and repeatedly caused to be
reported in the media their untrue claim that Plaintiffs were fired because their
work was substandard, and not for the true reasons: because Plaintiffs refused or
questioned directives of Courser and Gamrat which were inappropriate and an
abuse of government resources, and because Plaintiffs reported Courser and
Gamrat's wrongful actions to House leadership, namely Messrs. Saari and Swartzle
and Speaker Cotter.

54.    Speaker Cotter publicly denied knowing anything about the matters
reported in the August 7, 2015 Detroit News story prior to its publication except for
the rampant Lansing rumors that Courser and Gamrat were having an
extramarital affair.

55.    On August 7, 2015, Speaker Cotter publicly directed the House
Business Office, via Mr. Bowlin, to conduct an investigation into the misconduct in

office and abuse of taxpayer resources by Courser and Gamrat.  Upon information and belief, neither Speaker Cotter, Mr. Saari, Mr. Swartzle, nor anyone from the Speaker's office, had directed that any type of investigation take place prior to the public reporting of Chad Livengood in the Detroit News.

56.    The House Business Office subsequently conducted an investigation into the subjects of Courser and Gamrat's misconduct in office and abuse of their office, and interviewed Plaintiffs as part of that investigation.  Plaintiffs cooperated fully with the investigation.

*The Aftermath of Plaintiffs' Disclosure of Misconduct to the Media*

57.    On or about August 31, 2015, the House Business Office issued its Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat ("the Report").  In that Report, the House Business Office determined that Courser and Gamrat indeed were guilty of misconduct in office and abuse of their office.  The House Business Office also offered the conclusion that, "The evidence does not demonstrate that the terminations of Mr. Graham and Mr. Allard meet the exceptionally high bar of violating state public policy or that they fall under the protections of whistleblower laws.  There is, however, documentary evidence that Representatives Courser and Gamrat were unsatisfied with the work performance of Mr. Graham and Mr. Allard as far back as January 2015, which corroborates the reasons offered for terminating Mr. Graham and Mr. Allard."

58.    Although the Report claims that the Speaker tasked the House Business Office with determining whether the House unlawfully terminated the employment of Plaintiffs, the House Business Office did not ask Plaintiffs for information on that topic in the course of its investigation, nor did they provide Plaintiffs with any opportunity to respond to materials and claims apparently submitted to the House Business Office by Gamrat and Courser.

59.    At the very least, the House Business Office recklessly made the foregoing statements in the Report suggesting that Plaintiffs' termination was justified, because it failed to collect evidence on that topic or provide Plaintiffs with an opportunity to respond to Courser and Gamrat's claims on that topic.  The Report also completely omitted the key facts of all of the times when Plaintiffs reported to Messrs. Saari and Swartzle, as they were instructed during orientation, about Gamrat and Courser's abuse of their staff and misconduct in office.  The House Business Office was in direct possession of all of these instances of reporting since Plaintiffs had recounted them for Mr. Bowlin during their exit interview with Messrs. Bowlin, Saari, and Swartzle.  The House Business Office Report also appeared to rely on the word of Courser and Gamrat, at least in part, for its conclusion that Plaintiffs' terminations were justified.  This was despite concluding throughout the remainder of the Report that the entirety of the great weight of evidence was that Courser and Gamrat were untrustworthy, had almost no credibility, and purposefully abused their offices, including their staff.

60.     The House Business Office's reckless and untrue conclusion in the Report that Plaintiffs' terminations were justified unfairly harmed their professional reputations.

61.     On September 3, 2015, a Detroit news station ran a story which included pictures of documents that Plaintiffs and apparently others provided to the House Business Office as part of its internal investigation of the foregoing events. Plaintiffs did not provide those documents to the Detroit news station running the story.  Upon information and belief, someone in House leadership leaked the documents, which were provided out-of-context and in a manner designed to further impugn Plaintiffs' professional reputations, by suggesting that they had somehow acted inappropriately while in the employ of the House and that their terminations were justified and not illegal. Some were emails sent after Plaintiffs had been fired and were not in any way relevant to the House Business Office investigation.

62.     On September 8, 2015, the House Business Office released a copy of the Report to the public on an Internet website.  The House Business Office negligently failed to appropriately redact Plaintiff's personnel records which were part of the Report, and in so doing, posted a variety of personal details about Plaintiffs on the Internet, most notably Plaintiffs' complete Social Security Numbers.

63.     In addition to publishing Plaintiffs' personnel records and sensitive personal data, the House Business Office also published a variety of routine work emails sent by Plaintiffs which were completely irrelevant to the investigation into

Courser and Gamrat's misconduct, but which were designed to attempt to embarrass Plaintiffs or impugn their professional or political reputations.  Upon information and belief, similar emails and papers of other parties, including Courser and Gamrat, were redacted or not published as part of the Report.

64.     Given the level of public interest in the investigation into Courser and Gamrat, agents of Defendant knew that the Report would be reviewed by a large number of people.  Even if Defendant itself had not published the report on the Internet, its agents were aware that it was very likely that the press would obtain a copy pursuant to the Freedom of Information Act and publish it themselves on the Internet.  Under any circumstances, the House had and has a duty to ensure that its employee personnel records would be protected from public disclosure, particularly sensitive data like complete Social Security Numbers.  But under this particular circumstance, the House had an especially significant responsibility and legal duty to be sure that the Report would not publicize private facts about Plaintiffs, knowing that the Report would receive immediate and wide public attention.

65.     Indeed, members of the media first alerted Plaintiffs to the fact that their complete Social Security Numbers were available for public consumption on the Internet.

66.     The House failed in its responsibility and breached its duty when its Business Office negligently published unredacted personnel information pertaining to Plaintiffs.

67.    Fraudsters and other criminals are able to use Social Security Numbers associated with a name to obtain fraudulent credit in someone else's name, take out loans, sign up for accounts of a variety of types, and commit other types of crime victimizing the person whose identity is stolen using their Social Security Number.

68.    Mr. Allard immediately contacted the House Business Office and requested that the unredacted Report be immediately removed from the Internet and replaced with an appropriately redacted version.  Counsel for Plaintiffs also made the same request of outside counsel for the House.

69.    Despite the immediate contacts to the House Business Office, it took the House approximately 24 hours to remove Plaintiffs' Social Security Numbers from the version of the Report placed on the Internet for public access.

70.    Even once the unredacted Report was taken down, it is impossible to completely scrub the unredacted version of the Report containing Plaintiffs' Social Security Numbers from the Internet.  Aggregator services and other companies and individuals who collect historic screen shots of Internet websites will continue to have the Report containing Plaintiffs' Social Security Numbers available for individuals who know how to access such services, and there is no way to track or limit that access.

71.    After the internal release of the Report, the House convened a Select Committee to consider whether Courser and Gamrat had committed misconduct or if other cause existed to recommend to the entire House to vote to expel Courser and

Gamrat from the chamber.  The Select Committee began its proceedings on or about the same day that the House made the Report and related documents public.

72.     It was made clear to Plaintiffs that Speaker Cotter, Mr. Swartzle, and/or other members of Republican leadership did not want Plaintiffs to testify at the hearing.  This was the impression left by the outside legal counsel representing Defendant.  In addition, at one point during the hearings, Mr. Allard called the office of Rep. McBroom, who was the chair of the Select Committee. Mr. Allard reported to Rep. McBroom's staff that he had noted inaccuracies in Mr. Swartzle's televised testimony before the committee, he noted what those were, and he offered to testify if it was necessary.  Instead of hearing back from Rep. McBroom or his office, Tim Bowlin, the director of the House Business Office, called Mr. Allard back and said he was calling at Mr. Swartzle's behest.  Mr. Bowlin said that Mr. Swartzle – who is a lawyer – wanted to meet with Mr. Allard immediately to discuss his testimony, even though Plaintiffs were represented by their own legal counsel by this time.

73.     Although making it clear that they would appear at the hearing if subpoenaed or if asked, Plaintiffs agreed that they were not necessarily eager to testify.  They did not wish to be further associated publicly with the behavior of Courser and Gamrat, and they knew they were sure to be asked questions about when they had reported concerns to Messrs. Saari and Swartzle, and Speaker Cotter.  They did not wish to be forced to publicly air the details of their conversations and risk that Messrs. Saari, Swartzle, or Cotter – powerful political

figures – would attack Plaintiffs' reputations further to try to discredit Plaintiffs and protect themselves.

74.     At 9:12 p.m. on September 9, 2015, the night before the final day of public hearings by the Select Committee, outside counsel for Defendant, Peter Ellsworth, emailed counsel for Plaintiffs wanting her to approve the following statement to be read on Plaintiffs' behalf by Rep. McBroom, the House Select Committee Chair ("the Committee Chair") first thing the next morning:

> "Ken [sic] and Ben have no comment and nothing to add beyondS [sic] what they told the house business office."

75.     After consulting with Plaintiffs at that late hour, legal counsel for Plaintiffs responded by email at 11:06 p.m. to Mr. Ellsworth's request by saying that the Committee Chair could read the following as Plaintiffs' statement:

> "Mr. Allard and Mr. Graham adamantly deny any suggestion in the House Business Office Report or otherwise that they were fired for good cause. Reps. Courser and Gamrat had them wrongfully terminated because they refused to misuse taxpayer resources or otherwise cover up other misconduct by Reps. Courser and Gamrat. Mr. Allard and Mr. Graham fully cooperated with the House Business Office investigation and provided relevant information they have to that body."

76.     The next morning, on September 10, 2015, the Select Committee conducted its final day of public hearings into the misconduct of Gamrat and Courser.  However, when the Committee Chair read what he said was the statement of Plaintiffs, it had been subtly but importantly changed from what Plaintiffs' attorney had provided the night before.  Instead of stating that Mr. Allard and Mr. Graham "…provided relevant information they have to [the House Business Office investigation]" as part of the statement Plaintiffs had approved, the

Committee Chair read that Plaintiffs provided "all pertinent documents to the House Business Office report."  The suggestion was made that Plaintiffs had been asked to provide information relevant to the legality of their employment termination, which they were not; and that the Report contained all relevant facts about the legality of their termination and what Plaintiffs had spoken about, to whom, and when, which it did not.

77.     Worse, though, during the final day of public hearings into the misconduct of Gamrat and Courser, was the Committee Chair's public response about why he was not calling Plaintiffs to testify. When asked by members of the Committee if Plaintiffs would be called to testify, the Committee Chair responded as part of the public hearing by claiming that Plaintiffs said that they would "plead the Fifth" if asked to testify, and therefore he would not be calling Plaintiffs to testify.  Neither Plaintiffs nor their legal counsel ever said that or anything remotely like that.  During the remainder of the hearing, and the ensuing floor debates in the House lasting into the early morning hours of September 11, 2015, several other members of the House repeated the claim voiced by the Committee Chair that Plaintiffs were not present to testify because they were planning to "plead the Fifth," based on the representation of the Committee Chair.

78.     The public generally understands the expression "plead the Fifth" to mean that a witness is exercising his right under the Fifth Amendment of the U.S. Constitution to refuse to answer questions for fear he might incriminate himself.

79.     The suggestion by the House to the public by repeated use of the untrue statement that the House did not call Plaintiffs to testify during the public hearings because Plaintiffs planned to "plead the Fifth" was that Plaintiffs believed that they had done something illegal.  This untrue claim by the Chair of the House's Select Committee caused additional unwarranted damage to Plaintiffs' reputations.

### Count I – Violation of First Amendment Rights Pursuant to 42 U.S.C. § 1983

80.     Plaintiffs incorporate the allegations of all prior paragraphs as if set forth herein.

81.     Plaintiffs exercised their First Amendment rights as private citizens when they communicated with Messrs. Saari and Swartzle and Speaker Cotter as described in the foregoing paragraphs.  The events about which Plaintiffs communicated – in particular, Courser and Gamrat's misuse of state taxpayer resources for political purposes and activities, and their preparation and deceptive sending of the May 20 email designed to mislead the public and their constituents – were matters of public concern.

82.     Plaintiffs' communications to Mr. Saari, Mr. Swartzle, and Speaker Cotter were not made as part of their official duties as staff members of the offices of Courser or Gamrat, nor made pursuant to any of their responsibilities as staff members of the offices of Courser or Gamrat.

83.     Defendant wrongfully terminated Plaintiffs' employment in retaliation for Plaintiffs' exercise of their First Amendment rights to speak on matters of public

concern.  These matters of public concern included information that Courser and Gamrat misused state taxpayer resources for political purposes and activities, and that they were responsible for the deceptive sending of the May 20 email designed to mislead the public and their constituents.

84.     By terminating the employment of Plaintiffs, Defendant violated Plaintiffs' Constitutional rights under the First Amendment.

85.     As a result of the foregoing, Plaintiffs lost earnings and benefits and suffered mental anguish, emotional distress, unfair reputational damage, and undue harm to their careers for which Defendant is liable.

WHEREFORE, Plaintiffs Keith Allard and Benjamin Graham demand judgment against Defendant for any and all economic and non-economic compensatory damages for whatever amount the jury finds necessary, and further demand judgment against Defendant for punitive damages for whatever amount the jury finds necessary, plus the costs of this action, attorneys' fees, interest and such other relief as this Court deems just, proper and equitable.


**Count II – Violation of First Amendment Rights Pursuant to 42 U.S.C. § 1983**

86.     Plaintiffs incorporate the allegations of all prior paragraphs as if set forth herein.

87.     Plaintiffs exercised their First Amendment rights as private citizens when they communicated to Mr. Livengood with the Detroit News, as alleged in the

foregoing paragraphs, after their terminations.  The events about which Plaintiffs communicated were matters of public concern.

88.    Plaintiffs' communications to Mr. Livengood, and later to other reporters, were not made as part of their official duties as staff members of the offices of Courser or Gamrat or as public employees, nor made pursuant to any of their responsibilities as staff members of the offices of Courser or Gamrat.  Indeed, Plaintiffs' communications to Mr. Livengood were made after their termination from employment by Defendant.

89.    Defendant wrongfully retaliated against Plaintiffs because of Plaintiffs' exercise of their First Amendment rights to speak on matters of public concern by taking a number of adverse actions, including:

   a.   releasing private employment data, including their entire Social Security Numbers, and routine work emails, even though those were irrelevant to the House Business Office investigation or to public concern;

   b.   causing the public Report to be misleading and omitting several key facts known to Defendant about the legality of Plaintiffs' terminations, and the competency with which Plaintiffs performed their jobs; and

   c.   causing to be wrongfully and erroneously published and reported that Plaintiffs refused to testify at the Select Committee and/or were planning to "plead the Fifth" if called to testify.

90.     Upon information and belief, Defendant engaged in the foregoing acts of retaliation in an attempt to embarrass and harass Plaintiffs; cause damage to Plaintiffs' personal reputations; and/or obfuscate or cover up the knowledge of Defendant's agents regarding the foregoing events prior to Plaintiffs' termination.

91.     By engaging in the foregoing acts of retaliation, Defendant violated Plaintiffs' Constitutional rights under the First Amendment.

92.     As a result of the foregoing, Plaintiffs suffered mental anguish, emotional distress, unfair reputational damage, and undue harm to their careers for which Defendant is liable.

WHEREFORE, Plaintiffs Keith Allard and Benjamin Graham demand judgment against Defendant for any and all economic and non-economic compensatory damages for whatever amount the jury finds necessary, and further demand judgment against Defendant for punitive damages for whatever amount the jury finds necessary, plus the costs of this action, attorneys' fees, interest and such other relief as this Court deems just, proper and equitable.

### Count III – Violation of Michigan's Whistleblowers' Protection Act, Mich. Comp. Laws 15.361 *et seq.*

93.     Plaintiffs incorporate the allegations of all prior paragraphs as if set forth herein.

94.     Plaintiffs seek legal and equitable relief for Defendant's retaliatory and unlawful termination of Plaintiffs' employment in violation of the Whistleblowers' Protection Act, Mich. Comp. Laws 15.361, *et seq.*

95.     Defendant, the House of Representatives, was Plaintiffs' "employer," for purposes of Michigan's Whistleblowers' Protection Act.

96.     Courser and Gamrat were also Plaintiffs' "employers," for purposes of Michigan's Whistleblowers' Protection Act.  Both individuals had the power to hire and fire their own staff, directly supervise them, provide them with assignments, and generally direct their activities.

97.     Defendant had knowledge that Plaintiffs complained about violations of law and rules of the House of Representatives, and Defendant terminated Plaintiffs because of their protected activity.

98.     By terminating the employment of Plaintiffs, Defendant violated the Whistleblower Protection Act.

99.     As a result of the foregoing, Plaintiffs lost earnings and benefits and suffered mental anguish, emotional distress, unfair reputational damage, and undue harm to their careers for which Defendant is liable.

WHEREFORE, Plaintiffs Keith Allard and Benjamin Graham demand judgment against Defendant for any and all economic and non-economic compensatory damages for whatever amount the jury finds necessary, and further demand judgment against Defendant for exemplary damages for whatever amount the jury finds necessary, plus the costs of this action, attorneys' fees, interest and such other relief as this Court deems just, proper and equitable.

<u>Count IV – Termination of Employment in Violation of Michigan's Public Policy</u>

100.    Plaintiffs incorporate the allegations of all prior paragraphs as if set forth herein.

101.    Defendant's discharge of Plaintiffs from their employment violated Michigan public policy because Defendant fired Plaintiffs, and/or knew or should have known that Courser and Gamrat caused Plaintiffs' termination, solely in retaliation for Plaintiffs' reports to governmental authorities of violations of ethics rules, other House rules, and potentially campaign finance laws by Courser and Gamrat.

102.    Courser and Gamrat directly and intentionally requested that the House Business Office effectuate the termination of Plaintiffs' employment in retaliation for Plaintiffs' appropriate and laudable reports to governmental authorities – Messrs. Swartzle and Saari and Speaker Cotter – regarding wrongdoing by Courser and Gamrat.

103.    Defendant Michigan House of Representatives, through its designated agents, Mr. Saari, Mr. Swartzle, Courser, Gamrat, and possibly others, knew or should have known that the termination of Plaintiffs' employment was in retaliation for Plaintiffs' reports of wrongdoing to a governmental authority. Defendant, through its designated agents, either: (a) effectuated Plaintiffs' termination; (b) caused to be the termination to be effectuated; and/or (c) failed to remedy the unlawful termination when they learned of it no later than the same

day it occurred, with responsibility for knowing it was for a retaliatory, illegal

purpose.

104.    By terminating the employment of Plaintiffs under these conditions,

Defendant violated Michigan public policy, a common law tort under state law.

105.    As a result of the foregoing, Plaintiff lost earnings and benefits and

suffered mental anguish, emotional distress, unfair reputational damage, and

undue damage to their careers for which Defendant is liable.

WHEREFORE, Plaintiffs Keith Allard and Benjamin Graham demand

judgment against Defendant for any and all economic and non-economic

compensatory damages for whatever amount the jury finds necessary, and further

demand judgment against Defendant for exemplary damages for whatever amount

the jury finds necessary, plus the costs of this action, attorneys' fees, interest and

such other relief as this Court deems just, proper and equitable.


### Count V – Invasion of Privacy – Publication of Private Facts

106.    Plaintiffs incorporate the allegations of all prior paragraphs as if set

forth herein.

107.    On September 8, 2015, when the House Business Office released a copy

of the Report to the public on an Internet website and negligently failed to

appropriately redact Plaintiffs' personnel records, it posted a variety of personal

details about Plaintiffs on the Internet, including Plaintiffs' complete Social

Security Numbers.  It also included a number of emails and communications made

by Plaintiffs of complete irrelevance to the subject matter of the Report, although it had excluded or redacted emails and communications of other parties, including Courser and Gamrat.

108.   Defendant had a duty to keep Plaintiffs' personnel information, particularly that which could subject Plaintiffs to risk of identity theft, private.

109.   Defendant had a duty to keep other communications of Plaintiffs and information about them private or redacted where irrelevant to the subject matter of the Report.

110.   Defendant failed in its responsibility and breached its duty when its Business Office published unredacted personnel information and irrelevant communications and private information pertaining to Plaintiffs.

111.   Defendant's breach in publicizing Plaintiffs' private data damages Plaintiffs, putting them at lifelong, significantly-increased risk of identity theft. The House's breach will require that Plaintiffs purchase lifetime credit report monitoring and identity theft insurance, in addition to devoting a higher level of personal vigilance over their financial affairs to watch for fraud and other identity theft.

112.   Defendant's breach in publicizing irrelevant communications and private information pertaining to Plaintiffs damaged and continues to damage them, causing them embarrassment and harm to their professional and political reputations.

WHEREFORE, Plaintiffs Keith Allard and Benjamin Graham demand judgment against Defendant Michigan House of Representatives for any and all economic and non-economic compensatory damages for whatever amount the jury finds necessary, any and all exemplary damages that the jury finds necessary, plus the costs of this action, attorneys' fees, interest and such other relief as this Court deems just, proper and equitable.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiffs

Dated: December 7, 2015        By:   /s/ Sarah R. Howard
                               H. Rhett Pinsky
                               Sarah Riley Howard
                               Business Address and Telephone Number:
                               146 Monroe Center St NW, Suite 805
                               Grand Rapids, MI  49503
                               (616) 451-8496
                               HRPinsky@sbcglobal.net
                               SarahRileyHoward@hotmail.com

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiffs hereby demand same.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiffs

Dated: December 7, 2015        By:   /s/ Sarah R. Howard
                               H. Rhett Pinsky
                               Sarah Riley Howard
                               Business Address and Telephone Number:
                               146 Monroe Center St NW, Suite 805
                               Grand Rapids, MI  49503

(616) 451-8496
HRPinsky@sbcglobal.net
SarahRileyHoward@hotmail.com