UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————————

KEITH ALLARD and
BENJAMIN GRAHAM,

     Plaintiffs,

v.

MICHIGAN HOUSE OF
REPRESENTATIVES,

     Defendant.

Case No.: 1:15-CV-1259
Hon. Gordon J. Quist

**<u>HEARING REQUESTED</u>**

H. Rhett Pinsky
Sarah Riley Howard
Pinsky, Smith, Fayette & Kennedy, LLP
Attorneys for Plaintiffs
805 McKay Tower
146 Monroe Center N.W.
Grand Rapids, Michigan 49503
(616) 451-8496
hrpinsky@psfklaw.com
showard@psfklaw.com

Kathryn S. Wood
Peter H. Ellsworth
Jeffery V. Stuckey
Dickinson Wright PLLC
Attorneys for Defendant
500 Woodward Ave., Suite 400
Detroit, Michigan 48226
(313) 223-3500
kwood@dickinsonwright.com
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

# <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(6)</u>

# **TABLE OF CONTENTS**

BACKGROUND .................................................................................................2

STANDARD OF REVIEW ................................................................................5

ARGUMENT ......................................................................................................5

I.    Plaintiffs' speech was constitutionally protected under the First Amendment, and Count I of the Complaint may not be dismissed. ...............................................................................5

      A.    Plaintiffs were speaking as citizens and not merely as employees, or at least had mixed purpose in their statements. ...................................................................6

      B.    Plaintiffs' speech related to matters of "public concern." ..............11

II.    Defendant is not entitled to legislative immunity from liability on Plaintiffs' First Amendment claim in Count II ......................................... 13

III.    Plaintiffs have properly pled that they were engaged in activity protected by the Whistleblowers' Protection Act, and there is no requirement to plead specific statutes that could have been implicated by Plaintiffs' allegations ......................................................... 18

IV.    Plaintiffs agree to dismissal of their state law claim for Termination in Violation of Public Policy (Count IV) .............................. 19

V.    Plaintiffs' claim for Invasion of Privacy – Publication of Private Facts is not barred by any immunity theory and is more than sufficient to state a claim. ........................................................................ 20

      A.    The Invasion of Privacy claim is not barred by governmental immunity. ........................................................................ 20

      B.    Plaintiffs' Complaint alleges negligent and/or intentional acts by Defendant in publicizing private facts. Plaintiffs' pleading is sufficient to state a claim at this stage. ...........................................................24

VI.    This Court should exercise supplemental jurisdiction over Plaintiffs' state law claims because they share a common factual nucleus and are intertwined with the federal claims .........................................................25

CONCLUSION .................................................................................................25

i

Defendant, the Michigan House of Representatives, has moved to dismiss the complaint of Plaintiffs Keith Allard and Benjamin Graham, two young legislative aides who, by no fault of their own, have unfortunately been caught up in what Defendant characterizes as the "ongoing saga" of misconduct by disgraced former legislators Todd Courser and Cindy Gamrat. Plaintiffs did the right thing and reported misconduct on the part of their former bosses, as well as refused to participate in that misconduct. In retaliation, Defendant illegally terminated Plaintiffs from their jobs at the request of Courser and Gamrat. When Defendant's agents still refused to act on Plaintiffs' reports, Plaintiffs presented their evidence to the Detroit News. It was only then that Defendant took action, and Plaintiffs' whistleblowing eventually resulted in Courser and Gamrat's removal from office and now criminal charges against them.

Instead of just admitting that Plaintiffs' reports should have been investigated and appropriately handled earlier, and that they should not have been fired in retaliation for whistleblowing, Defendant's agents have continued to try to paint Plaintiffs as incompetent or somehow themselves sullied by Courser and Gamrat's misconduct. Plaintiffs' Complaint in this Court was their sole recourse to undo the reputational and financial damage that Defendant has inflicted. With exception of Count IV, from which Defendant is shielded because of state law immunity and which Plaintiffs will voluntarily dismiss, Defendant's various arguments do not save the House from answering for the damage done to Plaintiffs:

- Plaintiffs' Count I states a valid First Amendment claim because their speech was made as citizens, or at least with dual purposes as citizens and employees, and it was made on matters of public concern, not on mere "employment matters."

- Defendant is not shielded by legislative immunity from the First Amendment claim in Count II because its agents were not acting in a legislative capacity in the acts which form the basis of the claim.

- Plaintiffs' Count III Whistleblowers' Protection Act claim is more than sufficient to state entitlement to relief because of reports of known or suspected violations of law, given the substantive allegations and multitude of potential laws broken.

- Plaintiffs' Count V is not barred by governmental immunity under Michigan law because the tortious publication of private facts about Plaintiffs was ultra vires and not entitled to immunity, and it was sufficiently pled since there is a reasonable inference that Defendant's agents' acts were intentional.

Accordingly, Plaintiffs respectfully request that the Court denies Defendant's Motion, except to the extent that Plaintiffs will voluntarily dismiss Count IV because of state law immunity.

## BACKGROUND

Plaintiffs are former staffers for Cindy Gamrat and Todd Courser, who were members of the Michigan House of Representatives ("the House" or Defendant). Gamrat and Courser lost their seats in the House on September 11, 2015, when the House voted to expel Gamrat, and when Courser resigned shortly before the House was expected to expel him, after a House Select Committee determined that they were not fit to hold office and had abused the public trust. (Compl. ¶¶ 8-9; Page ID.2-3.) On several occasions during their employment from January 2 until July 6, 2015, Plaintiffs reported a variety of types of misconduct by Courser and Gamrat to members of the House leadership who had been designated to field employee

2

concerns. (*Id.* at ¶¶ 14, 19-22, 33, 35-36, 47; PageID.3-4, 6-7, 11, 12, 16.) Plaintiffs made repeated reports to two men in House leadership, Norm Saari and Brock Swartzle, because the House Business Office told new employees in orientation that they could take any concerns to them, or to Tim Bowlin, the director of the House Business Office. (*Id.* at ¶ 12, PageID.3.) At the time, Mr. Saari was the chief of staff of the Speaker of the House, Rep. Kevin Cotter. Mr. Swartzle was House Majority Counsel. Allard and Graham went multiple times to Saari and Swartzle, and once spoke to Speaker Cotter. (See infra.)

Plaintiffs' reports included that Courser and Gamrat, who were carrying on an extramarital affair, asked Plaintiff Ben Graham to send a deceptive email anonymously to Courser's own supporters and constituents that Courser said would act as a "controlled burn" to "inoculate the herd." (Compl. ¶¶ 31, 33; PageID.10-11.) Courser's "controlled burn" email made a variety of outlandish, untrue accusations about Courser and Gamrat, the hope being that any true information which came out about their affair would be ignored as another exaggeration. (*Id.*) Graham refused to send the email. (*Id.*) After Courser found someone else to send the email, Allard and Graham reported to Saari and Swartzle that Courser and Gamrat were themselves behind the email, and reiterated their prior concerns about the office. (*Id.* at ¶¶ 31-33; PageID.10-11.) Plaintiffs had also reported to Saari and Swartzle that Defendants required that they do political business with state resources, and attempted to misuse state resources, namely staff time, to cover up their affair. (*Id.* at ¶¶ 14, 19-22, 33, 35-36, 47; PageID.3-4, 6-7, 11, 12, 16.) Over the six months that

Plaintiffs spoke repeatedly to various officials, it appears that none of these officials ever investigated further or took any steps to stop the illegal activity.

Once Courser and Gamrat found out about Plaintiffs' reports to government officials working for the House, Courser and Gamrat directed Mr. Bowlin of the House Business Office to terminate Plaintiffs' employment on July 6, 2015, solely in retaliation for Plaintiffs' reports. (Compl ¶¶ 45-46; PageID.15-16.) Plaintiffs then requested a meeting with Mr. Bowlin, the director of the House Business Office, as well as Messrs. Swartzle and Saari. (*Id.* at ¶ 47; PageID.16.) They then informed Mr. Bowlin of what they had told Messrs. Swartzle and Saari. (*Id.*)

Plaintiffs then went to the Detroit News and provided evidence of their claims about Defendants, and on August 7, 2015, the News ran a story based on Plaintiffs' evidence. (Compl. ¶ 51-52; PageID.17-18.) Later that day, Speaker Cotter announced that he was directing the House Business Office to investigate Courser and Gamrat. (*Id.* at ¶ 55; PageID.18-19.)

On August 31, 2015, the House Business Office issued a report concluding that Courser and Gamrat had engaged in misconduct. (Compl. ¶ 57; PageID.19.) When the House Business Office published its "Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat" ("the Report"), it also included a conclusion that there was nothing illegal about terminating Plaintiffs. (*Id.*) The Report supported this conclusion by crediting Courser and Gamrat's position, despite finding that they lacked credibility in every other respect and had abused public resources, and by failing to mention any of the

instances when Plaintiffs had reported Courser and Gamrat's misconduct to House employees before going to the Detroit News. (*Id.* at ¶ 57-58; PageID.19-20.) Thereafter, leaks of documents and other materials pertaining to Plaintiffs also began to appear in various media sources, in an apparent attempt to embarrass or discredit Plaintiffs. (*Id.* at ¶¶ 48, 61-63, 107-112; PageID.16, 21-22, 33-34.)

The House formed a Select Committee to consider the matter of Courser and Gamrat's fitness to serve in public office, and the Committee conducted hearings. (Compl. at ¶ 71; PageID.23-24.) Afterward, the full House voted to expel Gamrat on September 11, 2015. Courser resigned before the House could vote to expel him.

On February 26, 2016, the Michigan Attorney General charged Courser with four felonies – three counts of misconduct in office under Mich. Comp. Laws § 750.505, and one count of perjury, contrary to Mich. Comp. Laws § 750.423. The Attorney General charged Gamrat with two felony counts of misconduct in office. Those criminal cases are pending.

<u>**STANDARD OF REVIEW**</u>

Defendant has accurately stated the Standard of Review.

<u>**ARGUMENT**</u>

I.    **Plaintiffs' speech was constitutionally protected under the First Amendment, and Count I of the Complaint may not be dismissed.**

First Amendment claims of public employees like Allard and Graham are subjected to a three-part test of requirements to state a claim: (1) the plaintiff engaged in constitutionally protected speech; (2) the plaintiff was subjected to adverse action or was deprived of some benefit; and (3) the protected speech was a

"substantial" or a "motivating factor" in the adverse action. *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). The sole portion of the test that the House argues was not pleaded as a matter of law is whether Allard and Graham engaged in constitutionally-protected speech.

To demonstrate that they were engaging in constitutionally protected speech, Allard and Graham must show that their speech touched on matters of public concern, and that their "interest in making such statements outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Banks*, 330 F.3d at 892. Speech on matters of public concern involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id.* at 893 (quoting *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).

### A. Plaintiffs were speaking as citizens and not merely as employees, or at least had mixed purpose in their statements.

A public employee must demonstrate that he is speaking not only upon matters of personal interest, but as "a citizen upon matters of public concern." *Banks*, 330 F.3d at 893. Speech of "mixed purpose" involving both personal and public matters is protected and suffices to state a First Amendment claim. *Id.* at 894. The key question is not whether a person is speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on a matter of public concern. *Id.* "In making this factual determination, we generally

6

look to what was said, rather than why it was said." *Id.* at 895 (internal quotation omitted).

In *Banks*, the Sixth Circuit reversed a grant of summary judgment of the claim of a school system employee who complained to a state agency about her employer's alleged hiring nepotism, failure to follow state law and internal procedures in hiring, and financial mismanagement. 330 F.3d at 890, 895-96. The employee, who was employed at various times as a substitute teacher and parent liaison, had tried unsuccessfully for several years to obtain a teaching position. *Id.* The Sixth Circuit found that violations of law like those the employee alleged were matters of public concern, and despite the employee's personal motivation of wanting a teaching position, this was enough to show the plaintiff uttered the speech as a citizen and was thus protected by the First Amendment. *Id.* at 896-97. "The First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Id.* at 896 (internal citation and quotation omitted).

Similarly, Plaintiffs' speech to Saari, Swartzle, and Cotter was made as citizens, or was at least made with dual purposes of their own interest as employees and of furthering the public interest. Plaintiffs reported Courser and Gamrat's instances of using or attempting to use public resources for political campaigning and to cover up their extramarital affair. Then Plaintiffs reported that Courser sent the "false flag" email in order to mislead constituents and the public. Graham met

7

with Saari and Swartzle on the premises of a private lobbying firm – not on state property – to discuss that Courser had asked him to send the email and had apparently found someone else to do it when Graham refused. These allegations ended up spurring the House to investigate Courser and Gamrat and take action to expel them from the chamber, as well as the Attorney General's eventual criminal prosecution of them. It is difficult to imagine statements which are a clearer example of having at least a dual purpose of furthering the public interest. The fact that Allard and Graham also sought a better working environment, i.e., free of being expected to break the law and free of abusive, retaliatory employers, in some of the speech does not save the House from First Amendment liability.

The House has also claimed that Plaintiffs were making statements "pursuant to their official duties," and thus not engaging in protected speech as citizens. This argument also looks at the context and content of the speech to determine if it was made because of an employee's official duties. See *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540-41 (6th Cir. 2012). The Sixth Circuit rejected a pursuant-to-official-duties defense in a case where a city's public records coordinator was terminated after complaining about improper use of city funds based on employee violations of leave policies. *Id.* at 541-42. Handy-Clay had not been asked to investigate the issue which she reported, nor was it part of her official duties as the public records coordinator to police employee leave time. *See id.* at 542. The Sixth Circuit noted that the plaintiff's statements were "extraordinary rather than everyday communication." *Id.* (quoting *Pucci v. Nineteenth Dist. Ct.*,

628 F.3d 752, 768 (6th Cir. 2010) (determining that court administrator's complaints about judge's religious references was not part of her official duties)).

Like in *Handy-Clay*, Allard and Graham's statements were certainly "extraordinary rather than everyday communication." See 695 F.3d at 542. In *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007), cited by the House, a park ranger made critical comments about her department's "morale and performance issues" but made the comments only in response to a paid consultant's queries, at the behest of her employer. Although Allard and Graham's speech covered topics they knew about by virtue of their employment duties, like *Hardy-Clay*, they had not been assigned to evaluate this particular topic as in *Weisbarth*. Accord *Pucci*, 628 F.3d at 768 (6th Cir. 2010) (rejecting defendant's claim that "an internal complaint about other court personnel" was part of court administrator's official duties because fact question remained on whether the duties fell within her assigned task and because "the nature of [the plaintiff's] complaints [about a judge's religious comments] implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection.").

The House claims that Allard and Graham's speech was made up the official "chain of command" when they spoke to Saari and Swartzle, and that this – as one factor to consider – supports a conclusion that the speech was made pursuant to their official duties. But Allard and Graham's most immediate supervisors were Courser and Gamrat, so speech to them would have been "up the chain of command"

and most likely to have been "pursuant to official duties," not speech to Saari and Swartzle. The fact that Saari and Swartzle had been named as resources for employee concerns does not make them part of Allard and Graham's "chain of command," and if they were, going to Saari and Swartzle certainly skipped steps in the chain. Even if this was "chain-of-command" speech, that factor would not be close to dispositive here, given the content of the speech itself.

Allard and Graham were making statements about much more than the "quintessential employee beef" that management acted incompetently. They were talking about use of public resources for improper purposes, like using staff time to send political communications and to cover up an affair. They reported Courser sending an email designed to deceive constituents, with Gamrat's approval. Indeed, the Attorney General eventually brought criminal charges against Courser and Gamrat on behalf of the people of Michigan arising out of the issues about which Plaintiffs complained. The fact that Plaintiffs sought to be moved to another House department or wanted relief from Courser and Gamrat's retaliation against Graham does not make the speech solely pursuant to their "official duties." Handy-Clay also complained about obstacles the city created in her position in its policies on releasing public records. Although the Court held that this was speech pursuant to her official duties and could not support a First Amendment claim, the presence of speech related to her duties did not permit dismissal of the free speech claim where other speech *was* protected. *See* 695 F.3d at 542-43. The same is true here.

**B.     Plaintiffs' speech related to matters of "public concern."**

Plaintiffs' speech, talking about two legislators who attempted to deceive their constituents and improperly used public resources, squarely touched on issues of "public concern." Speech is considered a matter of public concern when it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg*, 253 F.3d at 898.  This was not simply a "personnel dispute[] or complaint[] about an employer's performance." See *Albert v. Mitchell*, 42 Fed. Appx. 691, 693 (6th Cir. 2002). Indeed, Allard and Graham's speech ultimately led to Speaker Cotter's direction of the House Business Office to conduct an investigation, the House's convening a Select Committee, and the House taking the rare and drastic step to move to expel Courser and Gamrat. Plaintiffs' speech also led to the Attorney General's initiation of criminal charges against Courser and Gamrat. These were not solely matters of personal interest, but were instead directly and centrally related to the operation of government.

Although Allard and Graham reported much more than the affair of Courser and Gamrat, it is important to remember that in this instance, the affair itself – between two legislators who vigorously campaigned on a "traditional" marriage, Christian values message – was of public concern too. This was not a mere matter of "prurient interest," as analogized by the House in discussing the unpublished *Albert* case, which involved a report of an unelected state department supervisor having an affair. (PageID.89.) This issue was relevant to the voters' selection of elected

representatives who campaigned and legislated on a platform which made the affair itself arguably relevant to constituents. The fact that Courser and Gamrat used staff time, and thus public resources, to attempt to cover up the affair from their spouses was of independent public concern, and Allard and Graham spoke about this as well. Moreover, Allard and Graham's speech about being required to do political work on state time and reporting of Courser's sending of the deceptive "false flag" email meant to mislead constituents and political followers were yet additional and significant matters of public concern. Any of these issues by itself would be enough to constitute matters of "public concern" under the test, but together they easily sail over the hurdle.

The House's suggestion that the context of the speech could possibly outweigh the content in determining whether it is of "public concern" is from a case outside the Sixth Circuit where the facts are completely dissimilar. (PageID.89.) See *Miller v. Clinton County*, 544 F.3d 542, 550 (3d Cir. 2008). The *Miller* case was based on one letter presenting the plaintiff's grievances, where a "small portion" of that letter contained "brief references" to public concerns about ineffective operation of a probation office where a supervisor allegedly referred to probationers as "scum." *Id.* The Court there held that these two public-concern issues were "collateral to the thrust of her complaint[,]" which mainly focused on the plaintiff's personal dislike of her supervisor and inability to tolerate working for the supervisor. *Id.* at 550-51. In contrast, a large portion, if not all, of Allard and Graham's speech pertained to matters of public concern, not a "small portion." There were seven communications

12

– some of particular length and made in-person – over six months (from late January until Plaintiffs were terminated at the beginning of July). All of these conversations significantly referenced a multitude of issues of great public concern, central to concepts of informing and not deceiving the voters, as well as using public resources transparently, fairly, and for public business only. (See Summary Chart at PageID.88.) *Banks*, 330 F.3d at 892. These certainly were "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Banks*, 330 F.3d at 892.

Finally, the characterization of Allard and Graham's speech as "sporadic" complaints by "disgruntled staffers," allegedly having no role whatsoever in the eventual Select Committee's hearings leading to the expulsion and resignation of Gamrat and Courser, is disingenuous. Allard and Graham's speech had a central role in the information which came to light during the Select Committee's hearings, regardless whether the Committee called them to testify personally or not. At best, that characterization of events fails to view the allegations in the light most favorable to Plaintiffs, which the Court is of course required to do at this stage.

## II.   Defendant is not entitled to legislative immunity from liability on Plaintiffs' First Amendment claim in Count II.

Defendant correctly notes that the Supreme Court has extended legislative immunity under the Speech and Debate clause for any legislative activity which is

> **an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings** with respect to the consideration and passage or rejection of proposed

> legislation or with respect to other matters which the Constitution
> places within the jurisdiction of either House.

*Eastland v. United States Serviceman's Fund*, 421 U.S. 491, 504 (1975) (citation

omitted and emphasis added); *Gravel v. United States*, 408 U.S. 606, 622-23 (1972).

Plaintiff's Count II claims First Amendment retaliation by the House insofar as: (1)

the House released a report by its Business Office which contained superfluous

personal communications and personnel data of Plaintiffs; (2) the House's report

contained unwarranted and uninvestigated conclusions about the legality of the

termination of Plaintiffs which unfairly impugned their competence and

professionalism; and (3) the Chairman of the Select Committee caused to be falsely

reported that Plaintiffs would "plead the Fifth" Amendment if called to testify.

(Compl. ¶¶ 57-70, 76-79, 89; PageID.19-23, 25-27, 29.) Defendant claims that these

acts were "legislative" under the above definition and thus immune from liability.

On the contrary, these acts were not "legislative."

The House Business Office is a non-partisan arm of Defendant which

handles, among other administration issues, human resources matters for

Defendant. The House Business Office does not provide the policy staff for any

particular legislator, nor for any particular legislative committee. On August 7,

2015, after the Detroit News first broke the story of Courser attempting to cover-up

the affair with Gamrat by asking Graham to send the "controlled burn" email and

then firing Plaintiffs, Speaker Cotter noted in public that he had directed the House

Business Office to investigate misconduct in office by Courser and Gamrat. (Compl.

¶ 55; PageID.18-19.) On August 31, 2015, the House Business Office issued its

Report. (*Id.* ¶ 57; PageID.19.) As a document referenced in the Complaint, the Court may take judicial notice of the Report itself. (Exhibit 1.)[1] The investigation was not carried out as the business of any legislative committee, but as the business of an administrative office of Defendant. (See *id.*) The Report is signed on its first page inside the cover by Tim Bowlin, as "Chief Financial Officer and Business Director" of Defendant, not by any committee or legislator. (*Id.*) Mr. Bowlin's letter indicates that Speaker Cotter assigned him to investigate and prepare the report at the Speaker's directive, presumably since the Speaker is the head of administration for Defendant. The Report does not refer to the Speaker's assignment as one made in the Speaker's individual legislator capacity, which would be quite unusual an assignment for the House Business Office as a non-partisan arm of Defendant. Prior to publication, neither the House, nor any legislative committee of the House, nor the eventual Select Committee formed to investigate potential misconduct in office, adopted the Report. The Report did not constitute the findings of the Select Committee. (Cf. Compl. ¶ 71; PageID.23.) Distributing the Report to members of the House also does not make that distribution a legislative act any more than distributing a newspaper or mail to legislators would be a legislative act. (Cf. *id.*)

Moreover, Defendant was not acting as a legislative body when its administrative arm purportedly determined in its findings whether Plaintiffs' employment was unlawfully terminated, since there is no evidence that any legislators besides Speaker Cotter had any ability to influence the final Report. The

---

[1] Exhibit 1 includes only the Report itself, not the multitude of documents originally included with it as attachments, including Plaintiffs' personnel files and private emails.

Report was the act of an employer conducting an internal investigation, not a legislative act. The fact that this particular employer happens to be a public body and chose to make its investigation public does not transform the act of preparing and publishing the Report into a legislative act.

As Defendant notes, it is true that immunity extends to a legislator's aides if the activity at issue is "legislative." *Gravel v. United States*, 408 U.S. 606, 618 (1972). But the activity at issue here was not "legislative." Conversely, not every act by someone who happens to be a legislator or legislative aide has immunity as a "legislative" act. In *Gravel*, a Congressman's alleged arrangement with a publishing company to publish the Pentagon Papers was not an act of protected speech or debate within the Constitution. *Gravel*, 408 U.S. at 622-23. In addition, a news release by one member of a legislative body is not a "legislative" activity entitled to legislative immunity. *Hutchinson v. Proxmire*, 443 U.S. 111, 126-27 (1979). As the Court said:

> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, **they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House**. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but only when necessary to prevent indirect impairment of such deliberations.

16

*Id.* (quoting *Gravel*, 408 U.S. at 625) (internal quotations omitted and emphasis added). Members of legislative bodies may be held liable for republishing defamatory statements originally made in either House.  443 U.S. at 128-29.

Investigations which have been held to be "legislative" in nature and entitled to legislative immunity are those which are conducted by legislators or aides acting in a political, partisan and/or policy capacity. As the Supreme Court noted, "The acts of authorizing an investigation pursuant to which...subject materials were gathered, holding hearings where the materials were presented, preparing a report where they were reproduced, and authorizing the publication and distribution of that report" are all protected by legislative immunity. See *Doe v. McMillan*, 412 U.S. 306, 313 (1973) (concerning report of U.S. House of Representatives Committee on the District of Columbia). If the Select Committee had ordered the Report as part of its work – even had it ordered it from the non-partisan House Business Office – this would be a much closer question. But the Report and its publication was directed by one member as the administrative head of Defendant, as evidenced by the fact that he assigned it to a non-partisan business office, not legislative or partisan aides. See *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (holding immunity applied to work of a committee of legislators established by state senate resolution).

Plaintiffs concede that any legislator's untrue statements that Plaintiffs planned to "plead the Fifth" Amendment and would not testify at a hearing which were made directly as part of a committee hearing or on the floor of the House itself

are entitled to legislative immunity. But to the extent that any defamatory statement was republished by a member of Defendant, even if that statement was originally made in the House as part of a legislative proceeding (see Compl. ¶ 79), that statement is not entitled to immunity and could form the basis of a First Amendment retaliation claim. *Hutchinson*, 443 U.S. at 128-29. Plaintiffs are entitled to determine in discovery if any such statements were made under circumstances that are outside of legislative immunity.

**III.   Plaintiffs have properly pled that they were engaged in activity protected by the Whistleblowers' Protection Act, and there is no requirement to plead specific statutes that could have been implicated by Plaintiffs' allegations.**

In arguing that the Count III pleading is insufficient, Defendant has not cited any case pertaining to Whistleblowers' Protection Act claims, and certainly nothing requiring that it is necessary to plead specific laws potentially broken with respect to conduct reported by Plaintiffs. Plaintiffs pled that they reported violations of laws, and it would be reasonable for a jury to conclude by inference that laws were broken by the conduct that Plaintiffs reported. WPA does not require that Plaintiffs plead or prove that they cited particular statutes, nor that they conclusively establish that a law was actually broken. See Mich. Comp. Laws § 15.362 ("a violation or a suspected violation of a law" is enough).

To the extent that the Court holds that Plaintiffs are required to cite specific statutes in the pleading, the Court must grant Plaintiffs leave to amend their complaint in order to do so. See Fed. R. Civ. P. 15(a)(2).  There are a number of statutes violated by the conduct about which Plaintiffs complained, including:

- Mich. Comp. Laws § 15.342(3), requiring that "A public officer ... shall use personnel resources, property, and funds under the officer or employee's official care and control judiciously and solely in accordance with prescribed constitutional, statutory, and regulatory procedures and not for personal gain or benefit."; compare with Complaint ¶ 24;

- Mich. Comp. Laws § 750.478, prohibiting willful neglect of duty by a public officer; compare with Complaint ¶ 19a;

- Michigan Campaign Finance Act, Mich. Comp. Laws § 169.201 et seq., including but not limited to Mich. Comp. Laws § 169.257 (prohibiting a public body or person acting for a public body from authorizing use of funds, personnel, office space, computer hardware or software, or other resource for political purposes), and the implementing regulations of that act; compare with Complaint ¶ 17, 19b;

- 18 U.S.C. § 1343, the federal statute prohibiting wire fraud; compare with Complaint ¶ 31-32, in which Courser and Gamrat violated by causing the false and anonymous "controlled burn" email to be disseminated; and

- Mich. Comp. Laws § 750.505, under which the Attorney General eventually criminally charged Courser and Gamrat based on conduct complained of by Plaintiffs and brought to light by them.

Finally, and contrary to Defendant's suggestion, Plaintiffs' motives in whistleblowing are not relevant to WPA. The statute contains no requirement that Plaintiffs show "objective" public benefit. *Whitman v. City of Burton*, No. 294703, 873 N.W.2d 593 (Mich. Feb. 3, 2016). While Plaintiffs dispute the assertion that the concerns they brought to Defendant's agents were solely for private benefit and not of public concern, the issue is irrelevant under WPA. *Id.*

## IV. Plaintiffs agree to dismissal of their state law claim for Termination in Violation of Public Policy (Count IV).

Plaintiffs consent to dismissal of Count IV of their Complaint, their state common law claim of Termination in Violation of Public Policy. Plaintiffs intend to

make a motion for leave to amend their Complaint under Rule 15 to add a statutory claim under Mich. Comp. Laws § 15.342, which is not barred by any immunity.

## V.   Plaintiffs' claim for Invasion of Privacy – Publication of Private Facts is not barred by any immunity theory and is more than sufficient to state a claim.

### A. The Invasion of Privacy claim is not barred by governmental immunity.

Government immunity does not shield Defendant from Plaintiffs' invasion of privacy claim because the conduct giving rise to the tort was not part of a government function.  In the cases cited by Defendant in which Michigan courts have recognized governmental immunity under Michigan's Governmental Tort Liability Act, the analysis hinged on whether conduct giving rise to the claim was part of an authorized government function.  (See PageID.97-98.)  Because the courts found that the actions involved were related to a government function (specifically, the authorized duty to supervise), they held that governmental immunity applied.

For example, in *Dean v. City of Bay*, the Court held that the defendants had governmental immunity when a supervisor hired an investigator to conduct surveillance of a public employee.  No. 281847, 2009 WL 1439002, at *15-16 (Mich. Ct. App. May 21, 2009).  The Court held that, because the supervisor was acting under his authorized supervisory responsibilities, the tort claim was barred under the GTLA.  *Id.*  Accord *Hall v. Pontiac School District,* No. 269981, 2006 WL 2987702, at *2 (Mich. Ct. App. Oct. 19, 2006) (surveillance of school employee).

Similarly, the Court determined that Dearborn Public Schools was entitled to governmental immunity from a claim over installation of surveillance cameras in teachers' offices after a series of locker room thefts. *John Doe (1-3) v. Dearborn Pub.*

*Sch.*, No. 06-CV-12369-DT, 2008 WL 896066, at *1,9 (E.D. Mich. Mar. 31, 2008). The Court found that governmental immunity must be determined according to the "general nature of the activity of its employees" and as such, the installation of surveillance cameras was part of the general activity of the school to educate. *Id.* at *9. Because the action involved was part of a general government function, the Court held that governmental immunity applied. *Id.*

In contrast, the publication of private facts about Plaintiffs was not part of an authorized government function and hence the invasion of privacy claim is not barred by the GTLA. Plaintiffs' invasion of privacy claim stems from: (1) the online publication of the House investigation report – which included their Social Security numbers, personnel files, and voluminous unrelated personal emails; (2) the leaking of confidential information obtained in the July 6, 2015 exit interviews; and (3) the September 3, 2015 leaking of internal investigation documents to the press. (See Compl., ¶¶ 48, 61-63, 107-112; PageID.16, 21-22, 33-34.) When a governmental agency lacks legal authority to perform an activity, the activity is considered ultra vires, and the agency loses its governmental immunity under the GTLA. *Richardson v. County of Jackson*, 443 N.W.2d 105, 109 (Mich. 1989).

Leaking confidential information and documents to the press is an ultra vires act – neither Defendant nor its agents have legal authority to do it – and hence not protected by the GTLA. A government agent who leaks information to the press or another source is not merely improperly conducting an authorized act. Instead, "leaking" is an unauthorized, surreptitious release of information. There has been

no argument that leaking confidential information to the press is part of the "general [governmental] activity" of the House. Unlike the surveillance of employees in *Dean*, *Dearborn Public Schools*, and *Hall*, which was considered a government function because it was part of authorized supervision duties, leaking of documents and information to the press has no relation to any authorized government function. Rather than promote any authorized duty, such leaking of private information to the press undermines the government function of supervising employees by creating a climate of mistrust and insecurity. Because there is no government function related to leaking private, confidential information to the press, Defendant is not immune to the invasion of privacy claim.

Additionally, the House Business Office's internet publication of Plaintiffs' un-redacted personnel records was an ultra vires act, not an authorized government function, and thus not protected by the GTLA. Any authorization of Defendant to publish the Report is based on the House's governmental function to promote public awareness and accountability. Publication of the Plaintiffs' personnel files – including their Social Security numbers and numerous unrelated personal emails – was not an authorized government function. It had nothing to do with the government function of promoting public awareness and accountability and was not authorized as part of the report publication. In the above cases, the surveillance was undertaken as part of an authorized duty to supervise. Here, the publication of personal facts was done – not because of an authorized duty to disclose the investigatory report – but rather in an effort to embarrass and discredit Plaintiffs.

Defendant may not use the guise of a government function – publication of an investigatory report – to perform an ultra vires tortious act against the Plaintiffs.

If, as Defendant claims, inclusion of Plaintiffs' entire, un-redacted personnel file and their private, unrelated emails was part of an authorized government function to publish the Report, it would have included un-redacted personnel files and irrelevant emails from everyone involved in the investigation. However, the House Business Office specifically redacted confidential information related to other staff involved in the investigation and did not include similar personal emails from anyone other than Plaintiffs. (Compl. ¶ 107; PageID.33-34.) Unlike the cases cited in which surveillance of employees was part of authorized supervision duties, publication of private emails and Social Security numbers was in no way relevant to the Report's mission or for any legitimate governmental function.

In an unpublished case, the Michigan Court of Appeals affirmed denial of summary disposition on the question of governmental tort immunity in a tortious interference suit after the plaintiff was terminated from employment by a county, noting that GTLA "does not provide blanket protection if plaintiff can show that defendant acted with tortious intent outside the scope of his authority." *Lentz v. Isabella Cty.*, No. 292237, 2010 WL 3604397, at *2 (Mich. Ct. App. Sept. 16, 2010). The Court there found a defendant in the case, a county commissioner, could have acted outside of his authority by having a potential conflict of interest in violation of county commission rules, and could have been acting in pursuit of another interest, not his County authority. *Id.* at *2-3.

Similarly, Plaintiffs have plead sufficient facts to demonstrate that Defendant was acting outside the scope of its authority when it appended private facts about Plaintiffs to the Report and published those. Defendant's agents do not have blanket protection to publish whatever they wish if what they are publishing falls outside of the authority possessed by Defendant pursuant to a legitimate government function. The facts, as pleaded, support a conclusion that Defendant, through its agents, was acting in pursuit of another, tortious interest other than in the interest of an authorized governmental function. Accordingly, dismissal based on application of governmental tort immunity under GTLA would be improper.

**B. Plaintiffs' Complaint alleges negligent and/or intentional acts by Defendant in publicizing private facts. Plaintiffs' pleading is sufficient to state a claim at this stage.**

Plaintiffs acknowledge that the Michigan Court of Appeals has held that publication of private facts is an intentional tort under Michigan law. *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 920 (Mich. Ct. App. 2014), appeal denied, 868 N.W.2d 912 (Mich. 2015). However, the claim as pled, with all reasonable inferences drawn in Plaintiffs' favor as required at this stage, is sufficient to state an intentional tort. For example, Plaintiffs alleged that Defendant published Plaintiffs' communications "of complete irrelevance to the subject matter of the Report, although it had excluded or redacted emails and communications of other parties, including Courser and Gamrat." (Compl. ¶ 107; PageID.33-34.) Given the allegations of the Complaint as a whole, it is a reasonable inference that Defendant's agents published these private facts and communications intentionally

24

for the improper ultra vires purpose of embarrassing, harassing, and/or unfairly discrediting Plaintiffs. (See, e.g., Compl., ¶¶ 48-49, 61-63; PageID.16-17, 21-22 (alleging media leaks by Defendant's agents to try to discredit Plaintiffs).) Defendant may raise this after discovery as a summary judgment motion if the evidence supports only that Defendant's agents undertook these acts negligently but not intentionally, but there are not grounds to dismiss under Rule 12(b)(6).

**VI.   This Court should exercise supplemental jurisdiction over Plaintiffs' state law claims because they share a common factual nucleus and are intertwined with the federal claims.**

Plaintiffs disagree that their federal claims are subject to dismissal. It is, therefore, appropriate to exercise supplemental jurisdiction over state law claims where the state and federal claims derive from a common nucleus of operative fact. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Federal district courts should exercise supplemental jurisdiction where it results in judicial economy, convenience and fairness to litigants.  *Id.* at 726 (affirming supplemental jurisdiction over Labor Management Relations Act claim and state law tortious interference claims).  There is no reason not to exercise that supplemental jurisdiction here as the underlying facts are common ones.

**CONCLUSION**

Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motion except that they consent to dismissal of Court IV; and order all other necessary and appropriate relief.

Pinsky, Smith, Fayette & Kennedy, LLP
Attorneys for Plaintiffs

Dated:  March 18, 2016

By:     /s/ Sarah R. Howard
        H. Rhett Pinsky
        Sarah Riley Howard
        146 Monroe Center St NW, Suite 805
        Grand Rapids, MI  49503
        (616) 451-8496
        showard@psfklaw.com