UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEITH ALLARD and BENJAMIN
GRAHAM,

      Plaintiffs,

v.                                                Case No. 1:15-CV-1259

MICHIGAN HOUSE OF
REPRESENTATIVES,                        HON. GORDON J. QUIST

      Defendant.
_____/

## OPINION

This case arises out of the termination of Plaintiffs, Keith Allard and Benjamin Graham, who were previously employed by Defendant, Michigan House of Representatives (the House). Plaintiffs have alleged that Defendant terminated Plaintiffs for reporting conduct by two members of the Michigan House of Representatives. In particular, Plaintiffs reported that State Representatives Cindy Gamrat and Todd Courser were having an extra-marital affair, that they were neglecting their legislative duties, and that they were using state resources to cover up the affair. Plaintiffs have further alleged that when they brought their allegations against Gamrat and Courser to the media, Defendant retaliated against them by publishing personal and inaccurate information about Plaintiffs. Plaintiffs assert that Defendant's actions violated Plaintiffs' rights under the First Amendment and state law.[1]

Defendant has moved to dismiss Plaintiffs' complaint for failure to state a claim, and the Court has heard oral argument. After oral argument, the parties submitted supplemental briefs addressing the Supreme Court's decision in *Lane v. Franks*, --- U.S. ---, 134 S. Ct. 2369 (2014).

---

[1] Plaintiffs' also asserted a claim for violation of Michigan public policy, which Plaintiffs dismiss voluntarily.

*Background* ²

On January 2, 2015, Plaintiffs began their employment with the House. (ECF No. 1 at Page ID.2, ¶7.) Allard served as the chief of staff for Gamrat, and Graham served on the legislative staff of Courser. (*Id.* at Page ID.3, ¶¶10-11.) Shortly after taking office, Gamrat and Courser combined their legislative offices, including their staffs. (*Id.* at ¶13.)

Beginning in early January, Gamrat and Courser instructed their staffers to engage in political work during the workday. (*Id.* at Page ID.5 at ¶¶16-17.) For example, Gamrat and Courser instructed Plaintiffs to work on a private political event and to send out emails through a political database obtained and paid for by campaign committee funds. (*Id.*) Around the same time, it became clear to Plaintiffs that Gamrat and Courser were involved in an extra-marital affair. (*Id.* at Page ID.4, ¶15.) Gamrat and Courser told their staffers not to inform Gamrat's husband of Gamrat's and Courser's whereabouts and to lie about their schedules. (*Id.*)

During their House orientation, Plaintiffs had been told to report employment issues to Norm Saari, the chief of staff for the Speaker of the House (the Speaker), Brock Swartzle, House Majority Counsel, or the House Business Office (HBO), the administrative office of the House. (*Id.* at Page ID.3, ¶12.) During the second week of February, Plaintiffs met with Saari and reported that: (1) Gamrat and Courser were not working on legislative business during the normal work day and were requiring their staff to work nights and weekends as a result; (2) Gamrat and Courser were asking their staff to send political emails during the work day; and (3) Gamrat and Courser were having an affair. (*Id.* at Page ID.6, ¶19.) Allard met with Saari again about a month later and reported that Gamrat and Courser were continuing to abuse taxpayer resources, including their staff. (*Id.* at Page ID.7 at ¶21.) Allard asked Saari to find other House employment for Graham. (*Id.*)

---

² For purposes of the present motion, the Court assumes all allegations in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).

On May 15, 2015, Gamrat's husband told Allard that Gamrat had admitted having an affair with Courser. (*Id.* at Page ID.9 at ¶28.) On May 19, 2015, Courser asked Graham to meet at Courser's law office. (*Id.* at Page ID.9 at ¶30.) After speaking with Allard, Graham decided to record the meeting. (*Id.*) During the meeting, Courser asked Graham to send an anonymous email to Courser's supporters and others accusing Courser of having sex with male prostitutes and using drugs. (*Id.* at ¶31.) Courser said that the email would be so outlandish that it would constitute a "controlled burn" to "innoculate the herd" if news broke of Courser's affair with Gamrat. (*Id.*) Graham refused to send the email. (*Id.*) After the meeting, someone else sent the anonymous email requested by Courser. (*Id.* at Page ID.11 at ¶32.)

On May 21, 2015, Graham told Saari and Swartzle about Courser's request regarding the email. (*Id.* at ¶33.) Saari asked Graham to "stick it out" for the short-term. (*Id.*) Shortly thereafter, Graham sent Saari a text message stating that Courser was retaliating against Graham for refusing to send the email. (*Id.* at Page ID.12 at ¶35.) A few days later, a House Republican staffer told Allard that members of the Republican leadership knew that Courser had sent the email but that talking about the email would be considered a fireable offense. (*Id.* at Page ID.13 at ¶38.)

About the same time, Gamrat and Courser began a smear campaign against Graham. (*Id.* at ¶40.) In particular, Courser complained to Allard about Graham's work and instructed another staffer, Anne Hill, to look for an excuse to terminate Graham. (*Id.* at Page ID.14 at ¶¶40-42.) Unaware of Courser's request to Hill, Plaintiffs told Hill that Gamrat and Courser were having an affair, that Courser had asked Graham to send the email, and that Gamrat and Courser had asked Plaintiffs to engage in conduct that Plaintiffs' believed was unethical or illegal. (*Id.* ¶43.) Hill reported that conversation to Gamrat and Courser. (*Id.* at Page ID.15 at ¶44.)

On July 3, 2015, Gamrat's husband told Allard that he had been secretly listening to conversations between Gamrat and Courser and that Gamrat and Courser intended to fire Plaintiffs

3

in retaliation for making reports to Saari and Swartzle. (*Id.* at ¶45.) On July 6, 2015, Gamrat and Courser met with Plaintiffs. (*Id.* at ¶46.) Shortly after the meeting began, Gamrat and Courser "ushered" in the director of the HBO, who then escorted Plaintiffs to his office and terminated Plaintiffs' employment. (*Id.* at ¶46.)

In late July 2015, Plaintiffs brought their complaints about Gamrat and Courser to the Detroit News. (*Id.* at Page ID.18 at ¶51.) On August 7, 2015, the Detroit News published an article regarding those allegations. (*Id.* at ¶52.) That same day, the Speaker directed the HBO to investigate the allegations. (*Id.* at ¶55.) On August 31, 2015, the HBO issued a report on its findings (the Report), which concluded that Gamrat and Courser were guilty of misconduct in office. (*Id.* at Page ID.19 at ¶57.) The Report further concluded that Plaintiffs' termination was based on performance and did not violate any state law. (*Id.*) On September 8, 2015, the HBO publicly released a copy of the Report, which included Plaintiffs' unredacted personnel records and certain emails from Plaintiffs. (*Id.* at ¶62.) Plaintiffs immediately requested that the HBO redact certain personal information, which the HBO did about 24 hours later. (*Id.* at Page ID.23 at ¶68.)

After the Report was released, the House convened a Select Committee to determinate whether there was cause to expel Gamrat and Courser (*Id.* at ¶71.) During the Select Committee hearing, the Chair stated that he would not call Plaintiffs to testify because they would "plead the Fifth." (*Id.* at Page ID.26 at ¶77.) Other committee members repeated that statement. (*Id.*)

On February 6, 2016, the Michigan Attorney General charged Courser with one felony count of perjury and three felony counts of misconduct in office. The Attorney General charged Gamrat with two felony counts of misconduct in office.

*Discussion*

In Count I, Plaintiffs assert that Defendant violated Plaintiffs' First Amendment rights by terminating their employment in retaliation for Plaintiffs' reports to the House leadership. In Count

4

II, Plaintiffs assert that Defendant violated Plaintiffs' First Amendment rights by publishing information about Plaintiffs in the Report in retaliation for Plaintiffs speaking to the Detroit News. In Count III, Plaintiffs assert that their termination violated Michigan's Whistleblowers' Protection Act, M.C.L. § 15.361 *et seq.* Finally, based upon the release of the Report, Plaintiffs assert in Count V a claim under Michigan common law's protection against publication of private facts.

1.    Count I:  First Amendment—Pre-Termination Conduct

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958 (2006) (citation omitted).  "However, public employees do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012).  "[T]he First Amendment protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern." *Id.* However, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690 (1983).

In addressing First Amendment claims, courts must keep in mind that "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 525 (2004).  The Supreme Court's decisions "have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 547 U.S. at 420, 126 S.Ct. at 1959.  The premise underlying these decisions is "that while the First

5

Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance process.'" *Id.* (quoting *Connick*, 461 U.S. at 154, 103 S. Ct. at 1694).

### A. Speaking as a Private Citizen

The first question the Court must answer is whether Plaintiffs engaged in speech as private citizens or as public employees. The First Amendment does not insulate a public employee from employer discipline when the employee makes a statement pursuant to his official duties. *Garcetti*, 547 U.S. at 421, 126 S.Ct. at 1960. As the Supreme Court explained in *Garcetti*:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22, 126 S. Ct. at 1960. Thus, the Court found that a prosecutor was not speaking as a private citizen when he wrote a memo to his supervisor recommending that a case be dismissed. *Id.* at 425-26, 121 S. Ct. at 1962.

In 2014, the Court decided *Lane v. Franks*, --- U.S. ---, 134 S. Ct. 2369 (2014). Lane audited a public program and discovered that a state representative on the program's payroll, Schmitz, had not been reporting for work. *Id.* at 2375. Lane subsequently terminated Schmitz's employment. *Id.* Schmitz's termination captured the attention of the FBI and, following an investigation, Schmitz was indicted. *Id.* Lane testified during the grand jury proceedings and subsequent trial about the events surrounding Schmitz's termination. *Id.* Shortly thereafter, Lane's employment was terminated. *Id.* Lane filed suit, alleging retaliation in violation of his First Amendment rights. *Id.* at 2376.

The Court explained that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," but that "[t]he

6

critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379. The Court further emphasized the importance of public employee speech in the context of a public corruption scandal. *Id.* at 2380.

Defendant tries to dismiss *Lane* as a "straight-forward application of the Supreme Court's earlier decision in *Garcetti*," in the "unique situation" where a public employee must testify about workplace matters. (ECF No. 33 at Page ID.262-63.) Defendant's argument is based on an overly narrow construction of *Lane*. To begin, Defendant ignores *Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015), wherein the Sixth Circuit said that *Lane* narrowed *Garcetti* "by including 'ordinary' as a modifier to the scope of an employee's job duties."[3] *Id.* at 534 (internal quotation marks omitted). The Sixth Circuit instructed that, "[a]fter *Lane*, the *Garcetti* exception to First Amendment protection for speech residing in the phrase 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the *ordinary* responsibilities of his employment." *Id.* (emphasis added). So, the question then becomes whether reporting misconduct by Gamrat and Courser was within the ordinary responsibilities of Plaintiffs' employment—no matter what Plaintiffs' particular motivations may have been.

Defendant has pointed to nothing that even insinuates that Plaintiffs' reporting on the activities of Gamrat and Courser was in the ***ordinary*** course of Plaintiffs' duties. In fact, this is exactly what Gamrat and Courser did not want them to do. Plaintiffs allege that they reported, among other things, that: (1) Gamrat and Courser were violating rules against using taxpayer resources for political purposes (ECF No. 1 at Page ID.7, ¶ 20); (2) Gamrat and Courser were

---

[3] Defendant's reliance on cases from other circuits is misplaced. The Sixth Circuit's interpretation of *Lane*, which focused on the "ordinary responsibilities" of a plaintiff's employment, *see Boulton*, 795 F.3d at 534, is binding upon this Court.

7

abusing taxpayer resources (*id.* at ¶ 21); and (3) Courser requested that Graham send the infamous "controlled burn" email (*id.* at Page ID.12, ¶ 35). There is no indication that reporting misconduct was "within the scope of [Plaintiffs'] duties," *Lane*, 134 S. Ct. at 2379, or that Plaintiffs' complaints were "made in furtherance of the ordinary responsibilities of [their] employment." *Boulton*, 795 F.3d at 534. Plaintiffs were not charged with ensuring ethical compliance in their offices—rather, they were legislative staff who observed misconduct by elected officials. Accordingly, the Court concludes that Plaintiffs acted as private citizens when they complained about the conduct of Gamrat and Courser.

      B.      Matter of Public Concern

Even if Plaintiffs were speaking as private citizens, their speech must still be regarding a matter of public concern. In *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684 (1983), the Court addressed what were matters of public concern. In that case, an assistant district attorney, upon learning that she was going to be transferred, submitted a survey to her coworkers. The Court noted that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48, 103 S. Ct. at 1690. The Court found that, with the exception of one question, the focus of the survey questions—which addressed trust in various supervisors, level of office morale, and the need for a grievance committee—was merely an "extension[] of [the plaintiff's] dispute over her transfer" as opposed to being of "public import in evaluating the performance of the District Attorney as an elected official." *Id.* at 148, 103 S.Ct. at 1690. The Court noted, however, that speech could be of public concern if it brought to light actual or potential wrongdoing or breach of public trust or revealed that a public office was not discharging its governmental responsibilities. *Id.* at 148, 103 S. Ct. at 1690. The Court then considered the one survey question that did touch on a matter of

8

public concern, which asked whether "assistant district attorneys 'ever feel pressured to work in political campaigns on behalf of office supported candidates.'" *Id.* at 149, 103 S. Ct. at 1691. The Court observed that it had "recently noted that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights," and that "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Id. Boulton v. Swanson* gives the following examples of speech that addresses a matter of public concern: "speech [that] . . . alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form." *Boulton*, 795 F.3d at 532 (internal citations omitted).

Applying this law to the allegations, this Court finds that Plaintiffs' speech involved matters of public concern. Plaintiffs reported that Gamrat and Courser were not working on legislative business during the normal work day, that they used government resources to carry on an affair by having their staff report to work at night simply to hide the affair from their own families, and that Courser requested that his staff take time off work to send an email aimed at misleading constituents.

Defendant's argument that Plaintiffs' complaints did not relate to matters of public concern because they were focused on Plaintiffs' working conditions and desire for different employment ignores Plaintiffs' reports that Gamrat and Courser were using taxpayer resources to cover up their affair and mislead the public.[4] The series of events that unfolded once the allegations became public

---

[4] The instant case is readily distinguishable from *Albert v. Mitchell*, 42 F. App'x 691 (6th Cir. 2002), in which the Sixth Circuit held that a complaint that two corrections officers were engaged in an affair did not implicate a matter of public concern. *Id.* at 693. Unlike the present case, *Albert* did not involve allegations that taxpayer resources were being used to carry on or cover up the affair or that elected representatives were attempting to deceive their constituents. It is those facts—and not the affair itself—that implicate a public concern.

confirms that they implicated a public concern—the Speaker directed the HBO to conduct an investigation, a committee was formed to determine whether the House should expel Gamrat and Courser, Gamrat was expelled, and both legislators were charged criminally. The allegations concerned whether elected officials were fit to serve the offices to which they were elected, and thus would "enable the members of society to make informed decisions about the operation of their government." *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (internal quotation marks omitted). Accordingly, the Court concludes that Plaintiffs' allegations are sufficient to demonstrate that they spoke out on matters of public concern.

2. Count II: First Amendment—Post-Termination Conduct

Plaintiffs assert that Defendant retaliated against them by (1) releasing private and misleading information in the Report; and (2) stating that Plaintiffs refused to testify or "plead the Fifth" before the Select Committee. Defendant argues that it is entitled to legislative immunity for those claims.

Both state and federal law provide legislators with immunity from civil liability for legislative activities. *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 118 S. Ct. 966, 970 (1998); *Cotton v. Banks*, 310 Mich. App. 104, 116, 872 N.W.2d 1, 8 (2015). "An activity falls within the legislative sphere when it is integral to the legislative process[,]" or "when it is essential to the consideration and passage or rejection of proposed legislation or involves a matter placed solely within the jurisdiction of either house." *Cotton*, 310 Mich. App. at 116, 872 N.W.2d at 8.

The Report, which was completed by the HBO following an investigation into the allegations against Gamrat and Courser, was not related to typical legislative activities. Nonetheless, Defendant argues that legislative immunity attaches to the statements in the Report because the investigation was related to the House's duty to judge the qualifications of its members, a matter that is "placed solely within the jurisdiction of [the House]." *Id.*; Mich. Const. 1963, art. IV, § 16.

10

Plaintiffs' claim is based not on the portion of the Report discussing whether Gamrat and Courser were fit to serve in the House, but rather on that portion of the Report discussing the reasons for Plaintiffs' terminations. That portion of the Report—which relates to ordinary employment matters—does not constitute legislative activity. *See Zdziebloski v. Town of E. Greenbush*, 336 F. Supp. 2d 194, 203 (N.D.N.Y. 2004) (concluding that members of a municipal body were not entitled to legislative immunity for a decision not to hire an employee because it constituted "an administrative personnel matter that involves no policy formulation"); *Malec v. Sanford*, No. 97 C 7877, 1999 WL 183770, at *1 (N.D. Ill. Mar. 25, 1999) (finding that legislators were not entitled to immunity for claims based on employment decisions). Defendant cannot claim immunity for the results of its investigation into whether Plaintiffs performed their jobs competently simply because that investigation was undertaken in conjunction with one to determine whether legislators were fit to serve. Accordingly, Defendant is not entitled to legislative immunity for any statement in the Report related to Plaintiffs' terminations.

With regard to the Select Committee, Plaintiffs acknowledge that statements made during the committee proceedings are subject to legislative immunity. Plaintiffs argue, however, that they are entitled to discovery to determine whether such statements were repeated outside of the proceedings. A party's "wish to pursue discovery in order to find evidence to support his complaint does not relieve him of the obligation to plead sufficient facts to support a claim upon which relief may be granted." *Siddock v. Grand Trunk W. R.R. Inc.*, 556 F. Supp. 2d 731, 737 (W.D. Mich. 2008); s*ee also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) ("[T]here is no general right to discovery upon filing of the complaint. The very purpose of Fed. R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery.") (internal quotation marks omitted). Because Plaintiffs have not alleged that House members made statements outside official proceedings, they have not stated a claim with

11

regard to such statements. Accordingly, the Court will allow Count II to proceed only insofar as that claim is based upon statements in the Report.

3.  Count III: Michigan Whistleblowers' Protection Act

Plaintiffs assert a claim under the Michigan Whistleblowers' Act (WPA), alleging that they were terminated for complaining about violations of law and House rules. Defendant argues that Plaintiffs have failed to state a claim under the WPA because they never complained about violations of the law, but merely complained about their working conditions.

A plaintiff asserting a claim under the WPA must demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse employment action. *West v. Gen. Motors Corp.*, 469 Mich. 177, 183-84, 665 N.W.2d 468, 471-72 (2003). Protected activity includes a report to a public body of a violation or a suspected violation of state law. *See* M.C.L. § 15.362; *Truel v. City of Dearborn*, 291 Mich. App. 125, 138, 804 N.W.2d 744, 753 (2010). At the very least, Plaintiffs engaged in protected activity when they reported Courser's request that Graham send the infamous email. The Court makes no judgment as to whether that request actually violated any state law, but finds that it was reasonable for Plaintiffs to suspect that it did.[5] Accordingly, Plaintiffs may proceed with their WPA claim.

4.  Count V: Publication of Private Facts

Plaintiffs assert a state law claim for disclosure of private facts based on Defendant's release of Plaintiffs' personnel records in the Report. Disclosure of private facts is an intentional tort. *Doe v. Henry Ford Health Sys.*, 308 Mich. App. 592, 598, 865 N.W.2d 915, 920 (2014). Plaintiffs' complaint asserts, however, that Defendant "negligently published unredacted personnel information

---

[5] Courser was later charged with the common law crime of misconduct in office for soliciting a state employee to send an email to cover up his affair.

pertaining to Plaintiffs." (ECF No.1 at Page ID.22.). Because Plaintiffs allege that Defendant acted negligently, rather than intentionally, they have failed to state a claim for publication of private facts.

### *Conclusion*

Plaintiffs may proceed with their claims under the First Amendment, with the exception of any claim based on statements made by individual legislators. In addition, Plaintiffs may proceed with their claim under the WPA. The Court will dismiss Plaintiffs' claim for publication of private facts.

A separate order will issue.

Dated:  August 1, 2016                                     /s/ Gordon J. Quist
                                                        GORDON J. QUIST
                                                   UNITED STATES DISTRICT JUDGE

13